***Thurman King v. City of Rockford, et al.***

U.S.D.C. Western District of Michigan Case No. 1:21-cv-259
Honorable Jane M. Beckering

**Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment**

# Exhibit 9

```
1                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF MICHIGAN
2                           SOUTHERN DIVISION

3

4    THURMAN KING,

5

6            Plaintiff,

7    vs.                                  Case No. 1:21-cv-259

8                                         Hon. Paul L. Maloney

9    CITY OF ROCKFORD; ROCKFORD

10   DEPARTMENT OF PUBLIC SAFETY;

11   OFFICER ZACHARY ABBATE (individually);

12   and OFFICER JASON BRADLEY (individually),

13

14           Defendants.

15

16

17                      VIDEOTAPED DEPOSITION

18

19   DEPONENT:   GLENN DAVID ROBINSON

20   DATE:       Monday, January 3, 2022

21   TIME:       2:13 p.m. EST

22   LOCATION:   Via Zoom videoconference

23   REPORTER:   Elizabeth G. LaBarge, CSR-4467

24   JOB NO:     17172

25
```

```
1              chief.
2     Q   You have been the chief of the Rockford Police
3              Department since February of 2019?
4     A   Yes.
5     Q   And you were the chief on March 20th, 2019, the date of
6              the incident we're here for, correct?
7     A   Yes.
8     Q   And as far as the chain of command then on March 20th,
9              2019, did you report up to anyone in Rockford?
10    A   Yes.
11    Q   Who would that have been?
12    A   Dave Jones.
13    Q   And that's the same David Jones that was the prior
14             either chief or director of Public Safety?
15    A   Yes.
16    Q   What -- on March -- in March of 2019, what was David
17             Jones's position?
18    A   Director of Public Safety.
19    Q   As chief of the Rockford Police Department -- first of
20             all, do you know, is there a written job description
21             of -- of that position?
22    A   The best I can recall, I don't believe so at the time.
23    Q   In March of 2019, you don't believe there was a
24             written --
25    A   I don't believe that --
```

```
1            (inaudible) --

2                 MR. CALLAHAN:  Can I -- I've got an objection on

3        the basis of form.  Are you talking about written --

4                 MR. DREW:  Yeah, let me --

5                 MR. CALLAHAN:  -- policies?

6                 MR. DREW:  -- let me -- let me explain something,

7        that's a good objection.

8    BY MR. DREW:

9    Q    When I say practices or procedures, I'll be talking

10       about things that are done as a custom, but may not be

11       in writing.  If it's a procedure, I will be referring to

12       a written procedure; if it's a policy, I will be

13       referring to a written policy, I think, unless I try to

14       clean it up otherwise.  So let me --

15                MR. CALLAHAN:  Okay, thank you.

16                MR. DREW:  Yeah.

17   BY MR. DREW:

18   Q    As a lieutenant, were you involved in any way with the

19       review of -- of policies or procedures, the written

20       policies or procedures?

21   A    To some extent, yes.

22   Q    You -- and as chief, once you became chief in February

23       of 2019 to the present, have you been involved in the

24       policies and procedures, the written policies and

25       procedures of the Rockford Police Department?
```

1      Robinson, watched the video of the incident"?  Yeah,

2      okay.

3   BY MR. DREW:

4   Q    You indicated, Chief, in this report that, quote:

5             "Looking at the video which I watch

6             several times you could see brake

7             light on the car and the car

8             slowing down but I couldn't tell

9             from the video if the car comes to

10            a complete stop or not."

11       Did I read that accurately?

12  A    Correct.

13  Q    And that was the wording you chose to put in this report

14      after reviewing the video; is that correct?

15  A    Correct.

16       MR. DREW:  Kathryn, I need you to exit the

17      screen-share because I'm going to try to pull up the

18      video.  And what I'm going to do, it is huge, counsel,

19      I'm going to ask that it be marked as Exhibit 3.  I

20      don't know how we end up transmitting it or if we can,

21      but...

22       (Exhibit 3 marked for identification.)

23       MR. DREW:  Let me pull this up.  Just for the

24      record, the video I'm going to try to pull up, because

25      there's two of them, is the one ending in 2001i200.  I

```
 1        two reasons:  One, I stopped at the stop sign; and two,
 2        my light was on, correct?
 3    A   He did not say that.  He talked about the license plate
 4        being on and the he stopped for the stop sign.
 5    Q   You're aware, aren't you, as chief of police of there
 6        being a lot of discussion about stopping
 7        African-Americans, coming up with your taillight is out
 8        or bogus reasons to stop and then search them and try to
 9        find something?  And I'm not saying that -- you're aware
10        of that being an issue in the community of policing and
11        you were aware of that in March of 2019, that those were
12        issues, correct?
13            MR. CALLAHAN:  Objection, form and foundation.
14    BY MR. DREW:
15    Q   You may answer.
16            MR. CALLAHAN:  If you understand the question.
17            THE WITNESS:  Oh.
18    A   Yes.
19    BY MR. DREW:
20    Q   Is it your testimony, sir, that you did not look at the
21        video to determine whether your officer was accurate in
22        stopping him, claiming that his license plate light was
23        out, you didn't look for that?
24    A   Yes, I did look for that at the video.
25    Q   And I think you've indicated that you did look at the
```

1      video with the intent of determining whether Mr. King

2      had stopped at the stop sign, since your officer was

3      indicating that he didn't, correct?

4   A   Correct.

5          MR. CALLAHAN:  Steve, can we take a little break?

6          MR. DREW:  Was there an answer to that question?

7   A   I said correct, yes, I looked at the video for that.

8          MR. DREW:  Yes.  How long do you want?  The record

9      should reflect --

10         MR. CALLAHAN:  (Inaudible).

11         MR. DREW:  I'm sorry.  Go ahead.

12         MR. CALLAHAN:  Five minutes, Steve.

13         MR. DREW:  Okay.

14         VIDEOGRAPHER:  Off the record at 3:26 p.m.

15         (Whereupon a break was taken.)

16         VIDEOGRAPHER:  We are back on the record at

17     3:33 p.m.

18         MR. DREW:  Thank you.

19  BY MR. DREW:

20  Q   Chief Robinson, after you reviewed the videos, you had

21      the authority as chief to indicate that this was a false

22      stop or an unconstitutional stop and to halt it at that

23      point; is that correct?

24  A   Yes.

25  Q   And you had the ability to void the arrest and apologize

```
1          to Mr. King for your officer's actions; is that correct?

2    A     Correct.

3    Q     I'm going to, while I have the video up, and I'll take

4          it off in a minute, but I'm going to show the -- I'll

5          start it again, and this is Exhibit 5, I think, and I'm

6          going to show it as he makes his -- puts his turn signal

7          on, makes his turn, and then turns left into his

8          driveway.  And the reason I'm showing it to you is I

9          want to ask you reviewing this, did you see -- we don't

10         need to talk about your thoughts about the stop sign and

11         whether he stopped or not, but did you see any evidence

12         of erratic driving, such would be probable cause for

13         driving under the influence of alcohol or drugs?  So I'm

14         going to show it to you from the time -- the beginning

15         of it until he drives into his driveway and then I'm

16         going to ask you that question.  So we're showing

17         Exhibit 5 starting at 22:56:04 seconds and it will go

18         to -- and I'll identify it where we stop it.

19              COURT REPORTER:  Excuse me.  This is Exhibit 4,

20         Mr. Drew.

21              MR. DREW:  No, no, this is Exhibit 5.  Exhibit 5 is

22         the one with the bright one, it's 1i100, or maybe I'm

23         wrong.  Wait a minute.

24              MS. BOYD:  Exhibit 1, Exhibit 2, and then 3 and 4.

25              MR. DREW:  Oh, I'm sorry.  That's why she's here.
```

```
1           chief, that if your officer lied about the reason for
2           the stop, that he really -- the license plate light
3           really was on, that he really did stop at the stop sign,
4           but lied to justify the stop, that that would be a
5           policy violation of your department?
6    A      You're saying hypothetically?
7    Q      Yes.
8    A      That would be a violation, yes.
9    Q      And I think you already said if he lies about it as to
10          the reason for the stop, the light was on, he did even
11          stop at the stop sign, that would be an unconstitutional
12          deprivation of his Fourth Amendment right, correct?
13              MR. CALLAHAN:  Objection, foundation.
14   A      Correct.
15   BY MR. DREW:
16   Q      It ends by saying:
17                  "After reviewing the incident, I do
18                  not see any need for additional
19                  training or revision of department
20                  policies."
21          Did I read that correctly?
22   A      Yes.
23   Q      Was Officer Abbate disciplined at all for any aspect of
24          this encounter, including the traffic stop of Thurman
25          King?
```

| | | |
|---|---|---|
| 1 | A | No, he was not. |
| 2 | Q | Was he counseled at all -- and I should have asked |
| 3 | | it -- I'm assuming from your answer that he was not |
| 4 | | given any written discipline, I didn't see anything in |
| 5 | | his file, let me -- I'm talking too much. |
| 6 | | I assume from your answer that Officer Abbate did |
| 7 | | not -- that he received no written discipline arising |
| 8 | | out of the events of March 20th, 2019, including the |
| 9 | | initial traffic stop, correct? |
| 10 | A | Not from me, no. |
| 11 | Q | Well, you were the chief.  Are you aware of him getting |
| 12 | | any discipline from anybody? |
| 13 | A | No, I am not. |
| 14 | Q | Did he receive, to your knowledge, any unwritten |
| 15 | | discipline, counseling, a look, anything in reference to |
| 16 | | this stop, Officer Abbate? |
| 17 | A | Not that I'm aware of. |
| 18 | Q | At any time during your interaction with Mr. King either |
| 19 | | on March 22nd or March 25th or March 26th, 2019, was he |
| 20 | | at any time belligerent toward you, anything of that |
| 21 | | nature? |
| 22 | A | Mr. King? |
| 23 | Q | Yes. |
| 24 | A | No. |
| 25 | Q | The 2010 census, are you generally familiar with |

| | | |
|---|---|---|
| 1 | | it was ordered by Judge Benson, Judge Curt A. Benson |
| 2 | | -- go up a little bit -- on July 2nd, 2019. |
| 3 | | Does that refresh your recollection at all that |
| 4 | | these charges were in total dismissed by the Court? |
| 5 | A | I don't think I've ever seen this document, but I |
| 6 | | understand that they were dismissed. |
| 7 | Q | Did you have any conversations with the prosecuting |
| 8 | | attorney or anyone in his office about the interest of |
| 9 | | justice and why they were being dismissed? |
| 10 | A | Yes. |
| 11 | Q | And did you -- how many conversations did you have in |
| 12 | | that regard? |
| 13 | A | I believe just one. |
| 14 | Q | And was that after it was dismissed or before? |
| 15 | A | I don't remember. |
| 16 | Q | Did you make any notes of that conversation? |
| 17 | A | No. |
| 18 | Q | Who did you have the conversation with, was it with |
| 19 | | Chief Prosecutor Becker? |
| 20 | A | Yes. |
| 21 | Q | And tell me everything you remember about the |
| 22 | | conversation, the context, when you did, when it was, |
| 23 | | what was said? |
| 24 | A | He called or -- I don't -- I don't remember if -- I |
| 25 | | mean, he called or made contact, I don't know if it was |

1    through an email or a phone call and I had to call him

2    back, I don't remember how all that happened, but he had

3    called me and talked to me about this and said that they

4    were going to dismiss the charges.

5   Q  Did he say anything about, "I looked at the video and it

6    sure looked like he stopped at it to me," or it looked

7    like his license plate was on, did he say anything about

8    that?

9   A  He didn't say anything about the license plate light,

10   but said that he felt that it looked like he stopped for

11   the stop sign and that they were going to dismiss

12   charges.

13  Q  Anything else you recall about that conversation?

14  A  No, that was pretty much it, it was his discretion to do

15   that and that was the end of the conversation, and I

16   don't think I had any other contact with him about it.

17       MR. DREW:  I'm about to get into another area.  If

18   you want to take a break, this is a good time;

19   otherwise, I can keep going.

20       MR. CALLAHAN:  Sure.  About how much longer do you

21   anticipate, Steve?

22       MR. DREW:  About an hour.

23       MR. CALLAHAN:  Okay.  Thank you very much.  Okay.

24   How long did you want to take?

25       MR. DREW:  Five, ten minutes, whatever you want to

```
 1        do.
 2               MR. CALLAHAN:  Okay.  Yeah, I'll be back
 3        about -- how about 5:15?
 4               MR. DREW:  All right.  Is it that late already?
 5               MR. CALLAHAN:  Yeah.
 6               MR. DREW:  Yeah, that's fine.  I didn't realize it
 7        was that late.
 8               MR. CALLAHAN:  Okay.
 9               MR. DREW:  Okay, yeah, 5:15 is good.  I mean, I'm
10        assuming we want to get this done today; he's going to
11        be gone for a long time.
12               MR. CALLAHAN:  Yeah, let's get her done today.
13               MR. DREW:  Okay.  And I'm glad we're doing it today
14        and not the day before he's leaving.  Okay.
15               VIDEOGRAPHER:  Everyone ready to go off?
16               MR. CALLAHAN:  Thank you.
17               MR. DREW:  Yeah.
18               VIDEOGRAPHER:  Off the record at 5 p.m.
19               (Whereupon a break was taken.)
20               VIDEOGRAPHER:  We are back on the record at
21        5:17 p.m.
22               MR. DREW:  Thank you.
23   BY MR. DREW:
24   Q    Chief, it's my understanding that the City of Rockford
25        had a policy in place where officers were -- back in
```

1    March of 2019 where officers were required to make two

2    traffic stops per shift; is that correct?

3  A  Citizen contacts, yes.  Although it's an average of the

4    whole month, just not per day, per se.

5  Q  So it's your testimony that it wasn't two per shift, per

6    10-hour shift?

7  A  Average two per shift, but if they didn't, they could

8    make more the following day or whatever.

9  Q  So that it would average out to two per shift?

10  A  Correct.  And these --

11  Q  And --

12  A  -- are stops, not ticket related or anything like that.

13  Q  Well, you called it citizen contacts, but it really was

14    a require -- a mandatory requirement that they make two

15    stops, traffic stops, per shift or an average of what,

16    30 per month?

17  A  Not -- it just depends on how many shifts they work.

18  Q  Okay.

19  A  And if they're busy, they can state they're too busy and

20    they didn't have time, stuff like that.

21  Q  But it was -- and this was an official policy of the

22    City of Rockford, correct?

23  A  I guess I'd have to -- I don't remember if we put it in

24    policy form or it was more of a directive that we wanted

25    them to do to interact with the public more.

1    Q    This was a memo, as far as you're aware then, Chief,

2         that Mr. Abbate received on January 10th, 2019, an

3         email, correct?

4    A    I might not have seen this, I wasn't chief at the time.

5    Q    All right.  Okay.  And just so we complete the

6         identification of the exhibit, so then he responded two

7         days later on January 12th, 2019, to Aaron Sawyer at

8         6:06 a.m., Subject: Regarding December traffic stops,

9         and it said:

10                  "Agree.  1 short."

11             Correct, did I read that correctly?

12   A    That's what it says.

13   Q    So traffic stops, not just citizen contacts, correct?

14   A    It says:

15                  "Agree.  1 short."

16             Yes.

17   Q    But the concern is not just citizen contact, it's

18        minimum number of traffic stops for the shifts he worked

19        in December, correct?

20   A    I'm assuming, it says December, yes.

21   Q    That sounds to me like a quota for traffic stops; would

22        you agree?

23   A    No.

24   Q    A minimum -- you do not feel that doing a minimum of two

25        traffic stops per shift was a quota?

1    A    Well, I guess the number of stops, but we pertained it

2         more to the stops context, whatever you want to call it,

3         but it does not -- has nothing to do with writing

4         tickets.  So I guess that's --

5    Q    (Inaudible) part of this issue is why this man got

6         stopped and from our perspective why he lied about why

7         he stopped him.  That's a statement, not a question.

8              MR. DREW:  Can you pull up, please --

9              MR. CALLAHAN:  Steve, you need to speak up a little

10        bit, you're not coming through very good here.

11             MR. DREW:  I'll get closer.  Will you pull up,

12        please --

13             MR. CALLAHAN:  Thank you.

14             MR. DREW:  -- 753 and 75 -- yeah, 753?  That is a

15        counseling memo, we're going to mark it as Exhibit 14.

16             (Exhibit 14 marked for identification.)

17   BY MR. DREW:

18   Q    Are you -- let me identify it first.  It's a memo under

19        David Jones's letterhead, Rockford Department of Public

20        Safety, counseling memo dated February 4th, 2019,

21        Bates-stamped 753.

22             February 4th, 2019, is a month and a few days

23        before Mr. King was stopped; do you agree?

24             MR. CALLAHAN:  Steve, you froze.

25             MR. DREW:  Can you hear me?  Am I frozen?  Okay.

1           THE WITNESS:  I'm sorry.

2    A    Correct.

3    BY MR. DREW:

4    Q    Then, quote:

5                "In the event you are not able to

6                because you are too busy, you

7                understand how to document this on

8                your daily patrol log."

9         Correct?

10   A    Correct.

11   Q    I read that correctly?

12   A    Yes.

13   Q    Then you and Lieutenant Sawyer said, quote:

14               "It is important that you meet the

15               minimum performance standards to

16               avoid progressive discipline.  We

17               expect your performance will

18               improve and we will be monitoring

19               it closely over the next several

20               months," end quote.

21        Did I read that correctly?

22   A    Correct.

23   Q    You were advising at that time on February 4th, 2019,

24        that you were going to be looking at Officer Abbate's

25        traffic stops very closely over the next several months,

```
 1        including March 20th, 2019, when he stopped Mr. King,
 2        correct?
 3   A    You're using "very closely."  We monitor everybody's
 4        stops, so that's what we'd be doing.
 5   Q    Well, you told him that, in essence, if you don't meet
 6        the minimum performance standards of the goal of two
 7        stops per shift, you are going to be disciplined,
 8        correct?
 9   A    He could --
10   Q    That's what --
11   A    -- be, yes.
12   Q    -- you were telling him?  And that you expected his
13        performance will improve, even though he was only one
14        stop short in December, correct?
15   A    Correct.
16   Q    Did you say -- did you answer "Correct"?
17   A    Yes, I answered "Correct."
18   Q    I'm sorry.  And that you would be monitoring it closely
19        over the next several months, correct?
20   A    Correct.
21   Q    So he knew if he didn't make enough stops, traffic
22        stops, he could be disciplined, correct?
23   A    Correct.
24   Q    What -- the dailies, this mentions, Exhibit 14 mentions
25        dailies.  What are dailies, is that the daily logs?
```

```
 1              (Discussion held off the record between Mr. Drew
 2          and Ms. Boyd.)
 3              MR. DREW:  All right, I'm back on.  I think -- I
 4          just talked to Kathryn.  I think the only records we got
 5          were up to the 933 or something like that.  So let me
 6          just ask in general, and if there are more records, I'll
 7          reserve the right to finish this, but --
 8              MR. CALLAHAN:  Yes, yes.
 9    BY MR. DREW:
10    Q    What kind of complaints about Officer Abbate are
11         you -- prior to March 20th, 2019, were you aware of?
12    A    Well, and that might have been I misspoke, I don't know
13         of any specific citizen complaints about Officer Abbate,
14         we just review all reports on Officer Abbate and
15         reviewed things, so I don't know of any firsthand.  We
16         can look back.  Is there any personal citizen
17         complaints, I guess, is what I was --
18    Q    Okay.
19    A    -- referring to.
20    Q    Yeah, you may have misunderstood that.  I was --
21    A    Yes.
22    Q    -- only asking you about citizens --
23    A    Yeah, and that was my fault.  No, there's none that I am
24         aware of, no, he hasn't been there that long.
25    Q    Okay.  So I'm not sure I got an answer, but as far as
```

1        this system of requiring two traffic stops per 10-hour

2        shift, was there any process as a part of the system to

3        review the nature of the stops sort of as a check and

4        balance as to whether people were getting stopped

5        appropriately and things of that nature?

6    A   Not specifically associated to that, no.

7    Q   Other than an email like Officer Abbate got saying that

8        your stops weren't sufficient enough -- well, let me ask

9        you this.

10           Was there a understanding or process that you would

11       get that type of email as in Exhibit -- I think it was

12       13 indicating that you were short?

13   A   The officers would get stats at the end of the month put

14       up on all of the officers and where they were at.

15   Q   Okay.  And Exhibit 14, which is up here, like he was one

16       short, so if you were even just one short for the month,

17       would you get as a matter of process and procedure and

18       policy and custom a counseling memo?

19   A   Sometimes, sometimes not we'd get a counseling memo,

20       sometimes they would just talk to the officer.

21   Q   Were these statistics of traffic stops posted anywhere

22       for everybody to see how they were doing traffic

23       stop-wise?

24   A   Yes.

25   Q   And where were they posted?

1    A    In the hallway where our officers would be able to see

2         them.

3    Q    So was there kind of a running competition to see who

4         got the most traffic stops in Rockford?

5    A    No.

6    Q    And as I understand your testimony, sir, the dailies are

7         the only thing that is used to monitor the traffic

8         stops; is that correct?

9    A    For the officers to put down their stops, yes.

10   Q    Okay.  Would you -- and I guess, sir, you were -- on

11        February 4th when Exhibit 14, the counseling memo, came

12        out, that was right about the time you became chief,

13        correct?

14   A    Just before.

15   Q    Okay.  Because you're still a lieutenant at that point

16        on the memo?

17   A    Correct.

18   Q    Did you have any -- I know you didn't meet with him

19        that's referenced in Exhibit 14.  Did you meet with

20        Officer Abbate at any time about traffic stops or

21        anything between February 4th, 2019, when Exhibit 14,

22        the memo, came out, and March 20th, 2019, the incident

23        with Mr. King?

24   A    I do not believe so, not that I recall.

25   Q    And as you indicated, he was not disciplined in any way,

1       officer shall not be required to issue a pre-determined
2       or specified number of citations of state law or local
3       ordinances, correct?
4    A  Yes.
5    Q  And you would, obviously, say that our rule of mandatory
6       traffic stops gets around this law or doesn't apply to
7       this law because we don't require them to make a
8       citation, correct?
9    A  Correct, we don't care about citations at all, we can
10      have zero, it does not matter to us.
11   Q  Now, does it matter, did it matter to you that forcing
12      your officers to make a minimum of two traffic stops per
13      shift may lead to stopping the most vulnerable, maybe
14      the African-Americans, maybe the minorities, maybe not
15      the well connected, so that they won't be disciplined?
16   A  No.
17   Q  Are you aware --
18          MR. CALLAHAN:  (Inaudible) --
19   BY MR. DREW:
20   Q  -- were you aware of concerns raised that State Police
21      traffic quotas can lead to racial profiling, that the
22      American Civil Liberties Union indicated that?
23          MR. CALLAHAN:  Objection, form and foundation.
24   BY MR. DREW:
25   Q  Were you aware that in 2016, the American Civil

1    plate bright.

2    BY MR. CALLAHAN:

3    Q    Okay.  As to the whether Officer Abbate came -- strike

4         that.

5              As to whether Mr. King brought his automobile to a

6         complete stop or not, were you able to determine that

7         from your review of the videos?

8    A    No.

9    Q    Why is that?

10   A    Because watching the video, as Officer Abbate's car is

11        moving, Mr. King's car is approaching the stop sign, his

12        brake lights come on, Abbate's car is still moving, and

13        it's hard to see if Mr. King's car is still moving,

14        whether it's a slow roll through the stop sign, because

15        I wasn't in a position to see like Officer Abbate was.

16   Q    Okay.  Is it common practice to rely on the observations

17        of the officer in the field when reviewing videos of

18        that nature?

19   A    Yes.

20              MR. DREW:  Objection, leading.

21   BY MR. CALLAHAN:

22   Q    When you talked to the Prosecuting Attorney Becker about

23        the dismissal, did he talk to you about whether he

24        thought that it would be difficult to prove beyond a

25        reasonable doubt whether King brought his vehicle to a

1        camera?

2    A   Say -- repeat your question?

3    Q   We have reviewed two camera sightings of showing what

4        the cameras showed.  Is it your testimony that what the

5        camera showed was somehow distorted or not accurate?

6    A   That's not what I'm saying.  My perception of what I saw

7        from the video is -- can sometimes be different than the

8        officer that's actually sitting in the car live watching

9        the incident happen.

10   Q   As far as you're aware, the camera was functioning and

11       accurately depicted what was in front of it when

12       Mr. King's car came to the stop sign, correct?

13   A   Correct.

14   Q   And in your investigation report, you didn't at that

15       time say anything about Officer Abbate was in a better

16       position to see the car and whether it stopped or not

17       than yourself watching the video; did you?

18   A   Not specifically like that, no.

19   Q   Not specifically or not generally like that either; did

20       you?

21   A   Yes, I did.  I said -- yes, I did.  I said I didn't

22       know -- I couldn't tell whether the car came to a

23       complete stop or not and that's why what I just

24       explained, that's why I couldn't tell.

25   Q   Did you tell that to Prosecutor Becker when Becker said,

1    State of Michigan          )

2    County of Oakland          )

3            Certificate of Notary Public - Court Reporter

4

5         I certify that this transcript is a complete, true, and

6    correct record of the testimony of the witness held in this

7    case.

8

9         I also certify that prior to taking this deposition, the

10   witness was duly sworn or affirmed to tell the truth.

11

12        I further certify that I am not a relative or an

13   employee of or an attorney for a party; and that I am not

14   financially interested, directly or indirectly, in the

15   matter.

16

17        I hereby set my hand this 11th day of January, 2022.

18

19

20

21                   *Elizabeth G. LaBarge*

22                   Elizabeth G. LaBarge, CSR-4467

23                   Certified Shorthand Reporter

24                   Notary Public, Wayne County, Michigan

25